## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

BRENDA GREEN, *et al.*      )
       *Plaintiffs*        )
                   )

**vs.**                  )     CIVIL ACTION NO. 3:17-cv-149-MPM-JMV

                   )
MANAGEMENT & TRAINING      )
CORPORATION, *et al.,*        )
       *Defendants*      )

---

### MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs present this Memorandum of Authorities in support of their Response in opposition to the Motion for Summary Judgment.

### I.

### INTRODUCTION

Defendant Management and Training Corporation (MTC) is correct that John Robert Green, III, died in the Marshall County Correctional Facility (MCCF) operated by Defendant on January 1, 2017. He died of a heart attack. The Plaintiffs are the widow and three adult children of Mr. Green. They have filed this lawsuit pursuant to 42 U.S.C. §1983 for violation of Green's right under the Eighth and Fourteenth Amendments to timely care of his serious medical needs and state negligence law, asserting a long delay in assisting Green, due primarily to understaffing by Defendant, amounting to deliberate indifference and gross negligence, thereby causing his death.

1

## II.

## FACTS

**a.    THE PRISONERS' SWORN STATEMENTS**

The Plaintiffs rely on the sworn statements of two inmates, Kevin Wilson and Adam
Pinkton, obtained in November, 2017, that Mr. Green was already in crisis at least by 4:00 a.m.
in the morning of New Year's Day, 2017, and that no help arrived until a code blue was sounded
at about 6:47 a.m., even though inmates were banging on windows when correctional officers
would walk past. (Def. Col. Exh. E)   Despite their attempts to alert correctional officers, they
were ignored.   In fact both prisoners swore that the correctional officer who was in the tower,
*prior to* the arrival of CO Phillips, who arrived in the tower at Bravo 2 dorm at about 6:30 a.m.,
(Plaintiffs Ex. "1", Excerpts of Phillips depo., p.7, lines 16-19), was asleep and could not be
awakened despite the inmates' yelling and pounding on their window.

Kevin Wilson in his Declaration under penalty of perjury, stated that he became aware of
Green's distress at least as early as 4:00 a.m.  His reference for that hour was that kitchen staff
inmates were beginning to go to the kitchen to begin preparing breakfast.  He did not specify
where the inmates were coming from. If they were walking past the dorm in the hallway, they
would have been visible to inmates in the dorm.  Def, Col. Exh. G.  Adam Pinkton also declared
in his affidavit that he was awakened at around 4:00 a.m. by other prisoners shouting and
banging on window glass to get help for Green, who was unresponsive. *Id.*  Defense Attorney
Darryl Wilson confirmed in an email to undersigned counsel that, "We also learned that the
kitchen staff reports at the following times:  Morning shift is from 4:30 a.m.-1:30 p.m.  Evening
shift is from 1:00 p.m.-6:00 p.m....."  Plaintiffs' Exh. "2", email from Wilson to Lewis, March
25, 2019, 12:42 p.m..  That information supports the hour referenced in both initial sworn
statements.

**b.    THE RECANTING AFFIDAVITS**

Shortly before the pretrial motion deadline MTC obtained new affidavits from those
inmates, recanting their prior sworn statements as to the timeline so as to support MTC's defense
that its personnel acted promptly to assist Green. Def. Col .Exh. G. Both affidavits were obtained

2

on June 3, 2019. This writer cannot imagine a more compelling need for a jury to make a credibility determination as to which sworn statements are true, based on rigorous examination of each witness at trial. The key material fact in this case is the timeline from the onset of Green's heart crisis until help arrived. A jury would be entitled to hear sworn testimony about what prompted the men two and one-half years later to simultaneously decide to recant their prior sworn statements, which were made much closer in time to the death of Mr. Green, and presumably at a time when their memories of that crisis would be sharper. How did they refresh their memories? They do not say. The bald fact that their lives are completely under the control of the defendant cannot be overstated. They had nothing to gain by providing sworn statements, other than to do the right thing for the grieving family of their fellow inmate. Rather, they put themselves at risk of retaliation. This case should go to trial to find out what incentive they had to change their original story. According to the defense brief, the men recanted their earlier sworn statements after they were shown the video beginning when the prisoner approached the tower to alert the guard about the emergency.[1]

The plaintiffs submit the affidavit of Mr. Green's sister, Linda G. Smith, signed and notarized on February 26, 2018, to rehabilitate Wilson's and Pinkton's first sworn statements. Plaintiffs' Exh. "3", Affidavit of Linda Smith.

Although Mrs. Smith's affidavit contains some hearsay, it nevertheless factually confirms that Kevin Wilson and several other inmates called her on January 4, 2017 for the purpose of telling her what happened to her brother. Linda Smith is a proper rebuttal witness to Wilson's late-arriving affidavit recanting his earlier sworn statement. She confirms that Wilson told her the crisis began very early January 1 and that the reason for his call was to advise her of substantial delay by prison personnel in assisting John Green. Notably, Linda Green wrote down the phone number of each caller that morning, lending even more credence to her recollection. She made a note of Wilson's name and provided that to the undersigned, who then arranged a meeting with Wilson. The undersigned took notes and then, based on those notes, drafted a Declaration for Wilson, which he signed. Def. Col. Exh. E. Soon after, Adam Lee Pinkton, sent the undersigned an unsolicited sworn affidavit, *Id.* Pinkton corroborates Wilson's observations.

---

[1] Undersigned counsel is troubled that Wilson and Pinkton were shown the video without his presence or knowledge, particularly because there is no way of knowing what may have been said to them, as well.

3

It is undisputed that prison personnel did not assist Green until a code blue was called by a correctional officer, Jadominque Phillips, at 6:47, nearly three or more hours later.

### c.   CORRECTIONAL OFFICER JADOMINQUE PHILLIPS

The Defense in its brief obfuscates by omitting a critical undisputed fact. On unnumbered page 3 of the defense brief is written,

> "Additionally, Plaintiffs cannot show that Defendant MTC acted with deliberate indifference to Mr. Green's distress or the other inmates' calls for help, as the guard on duty, Jadominique Phillips, responded within minutes of the first call for help."

The unchallenged fact is that CO Phillips was *not* posted in the tower overlooking Bravo 2 dorm until she arrived late at 6:30 a.m. She was pulling a second 8-hour shift, but she was a half hour late starting the 6:00 a.m. shift because she had to wait in her previous shift position in the medical area until someone could relieve her of that position. During her deposition She complained the facility was short-handed. She complained that she was overworked and in June, 2017, she quit that job. She complained that she would sometimes have to follow a 16-hour shift with another immediate 16-hour shift.. Plaintiffs' Exh. "1", Phillips depo. Excerpts, p. 7, line 4-- p. 13, line 5.

Ten minutes after her 6:30 arrival in the tower, at 6:40 a.m., January 1, 2017, an unidentified inmate began to knock very hard on the window. The unidentified inmate explained that Green was holding his chest and gasping for breath. Phillips began to look around the dorm to discover the problem. She saw Green on the floor leaning against his cot. She sounded a code blue, which signifies an apparent life or death situation. The Defense is very misleading in ignoring the fact that a different officer was in the tower for the night shift which ended at 6:00 a.m. That person was the guard that Wilson and Pittston saw sleeping in the tower. Attorneys for both sides finally learned her identity during MTC's deposition. MTC's representative was able to disclose that Dorothy Gray was the corrections officer in the tower overlooking Bravo 2 Dorm during the night shift, which ended at 6:00 a.m, although she left early. (See below.)

4

Unfortunately, the Defendant apparently destroyed all January 1 video footage of Bravo 2 Dorm prior to the scene of the unidentified inmate seeking help for Green. The missing video perhaps could have settled the disagreement over the timeline from the first call for help to the rendering of aid.

**d.     CORRECTIONAL OFFICERS JESSICA WELLS AND DOROTHY GRAY**

During her Deposition CO Phillips was shown the work roster for the night shift extending from 10:00 p.m. on December 31, 2016 to 6:00 a.m. on January 1, 2017. Plaintiffs' Exh. "6", Marshall County Correctional Facility (MCCF) roster sheet for the night shift. That roster shows Jessica Wells assigned to the Bravo 2 Dorm tower during that shift. It also shows that the floor officer, Walter Rhone, was absent, and no one is listed in his place in the staff deployment box. Also Carolyn Campbell and Marissa Isom were absent. (Plaintiffs' Exh. "7", MTC representative Robyn Williams Depo. Excerpts, p.53, lines 3-15) Apparently, there was no officer on the floor in Bravo 2 Dorm during the night shift, which included the early hours of the morning on New Year's Day.

During Williams' deposition, it became clear from clocking records that Wells clocked out from the tower at 10:41 p.m. on December 31, less than an hour into her shift. Williams testified that Wells was replaced by Dorothy Gray, even though that was not disclosed in the roster. Williams explained that the clocking records showed Gray clocked in at 2:00 p.m. on December 31 and clocked out at 5:38 a.m. on New Year's Day. She worked two 8-hour shifts back to back, but clocked out 22 minutes before the end of the night shift. Plaintiffs' Exh. "7", Williams Depo. Excerpts, p. 47, line 22—p. 48, line 6. Thus, there was no officer in the tower for nearly an hour before Phillips arrived one-half hour late. Gray must be the officer who was in the Bravo 2 Dorm tower throughout the night on New Year's Eve and early morning hours of New Year's Day. Plaintiffs' Exh. "7", Williams Depo. Excerpts, p. 45, line 19--p.48, line 6. She is the officer who Wilson and Pinkton swore was asleep at her post in the tower and could not be awakened.

**e.     THE SEARCH FOR DOROTHY GRAY**

After learning that Dorothy Gray was in the tower on New Year's Day from midnight until 5:38 a.m., when she clocked out, and that she had done a double shift, lawyers for both

sides in this case agreed her deposition should be taken. At first the defense lawyers could not find her at her last known address in Clarksdale, Mississippi. However, they finally found her in Metairie, Louisiana, a New Orleans suburb, and served her with a deposition subpoena for May 31 at 10 a.m. at the defense firm's office in New Orleans. (Doc. 77) The lawyers and court reporter convened at 10:00 a.m. on the appointed day and waited for the arrival of Gray. She failed to show up. Attorney Wilson had her phone number. She had called him after being served with the subpoena to find out what that was all about. On this day Wilson tried to call her, but to no avail. After about one-half hour and receiving no reply to Wilson's repeated calls, Wilson read into the record a statement about her failure to appear, and the lawyers and court reporter dispersed. Since the pretrial motion deadline was only a week away, there really was no time to take any action on Gray's failure to appear. In any event the defense attorneys chose not to take action against her for ignoring their subpoena. No one, to undersigned counsel's knowledge, knows for sure the reason for her failure to appear for her deposition, but a juror can reasonably infer that she did not anticipate a pleasant experience. Her failure to abide by legal process leaves a question mark about the accuracy and reliability of her initialed head count record, especially in light of the sworn statements of Wilson and Pittman that she slept through her shift at least from 4:00 a.. m. forward, and in light of her clocking out without completing her shift. Unlike time clock records, the only records of head counts are handwritten entries which are initialed by the officer. Def. Exh. A. Apparently, there is no other way to verify the accuracy of the entries after the fact and there was no supervisor looking over Gray's shoulder.[2] Plaintiff's Exh."7", Wilson depo., p. 23, lines 1-9; p.59, lines 16-22.

Q.    "All right. So if the camera—if the video is no longer available, is there any other way to corroborate the—the handwritten entries that say that there actually was a head count each time they say it was?

A.    No, not that I'm aware of."


## f.    THE TRIP TO THE MEDICAL AREA

---

[2]  It is questionable whether the hand-written headcount entries with Gray's initials are admissible as an exception to the hearsay rule  pursuant to F.R.E. 803(6) since Gray skipped her scheduled deposition and the Defense has not provided certification of those records as required by F.R.E. 902 (11).  The Plaintiffs are filing a motion to exclude those records from the court's consideration.

The defense has produced video footage, beginning with an unidentified prisoner apparently signaling the watch tower for help for Mr. Green. CO Jadominique Phillips, who was stationed in the tower learned from the prisoner that "Green was having pain in his chest and trouble breathing." (Phillips Depo. Excerpts at p. 10, lines 12-13) She then spotted Green and could see he was "leaning on the side of his bed in pain." *Id.,* lines 14-15. At about 6:47 a.m. Phillips sounded a code blue, an alert that a prisoner is having a serious medical emergency. The first officer to arrive was the shift supervisor, Lieutenant Blake, followed at about 6:51 a.m. by two nurses, who arrived at the dorm with a stretcher and found Green on the floor leaning against his cot and holding his chest. (Phillips depo., Excerpts p. 26, line 25-p.27, lines 1-8.) The video continues as Green was picked up and strapped on the stretcher and taken through the prison halls to the medical area. At least once during the trip Green threw his head from side to side. The videos are not accompanied with audio and at no point do the videos show Green talking.

(Def. Exh. F, DVD's showing the dorm, showing the unidentified inmate alerting the tower, showing the arrival of nurses with a stretcher, then showing the trip from the dorm with Green on the stretcher.)

g.     **THE MEDICAL WARD**

The defendant has not provided any video inside the medical ward. CO Laterika Martin had posted as the medical officer shortly before Green reached the area. There was no one in that post prior to her arrival. (Plaintiffs' Exh."8", Martin depo. Excerpts, p.11, lines 7-9; p. 16, lines 7-9) When Green was in the medical area, a nurse asked him questions, but he could not answer. He just rolled his eyes. *Id.,* p. 34, line 6--p. 38, line 15. He died soon after his arrival. An ambulance was called at 7:10 a.m. Green died within a few minutes after that call.

h.     **PLAINTIFFS' EXPERT'S OPINION**

As the Defense has pointed out, Plaintiffs' medical expert, Evan L. Brittain M.D., MSc., an Assistant Professor of Medicine, Division of Cardiology at the Vanderbilt University Medical Center in Nashville, did rely heavily on Wilson and Pinkton's original sworn statements referring to 4:00 a.m. in finding that the long delay in obtaining medical help reduced the chance of Green's survival. Defense Exhibit I.

7

i.    **THE MISSING VIDEO**

Just over two months after Green's death, on March 13, 2017, undersigned counsel sent the prison warden a spoliation letter, requesting that all potential evidence in the case, including videos, be preserved. Plaintiffs' Exh. "9". The lawsuit originally was filed in the Marshall County Circuit Court on August 3, 2017. The Defendant promptly removed the case to federal court on August 17, 2017. Jarrad Garner, lead defense counsel, received notice of the spoliation letter by undersigned counsel in an email on August 24, 2017 and acknowledged that in a reply email the following day. Plaintiffs' Exh. "10". However, the video surveillance of Bravo 2 Dorm for January 1, 2017 from midnight until approximately 6:40 a.m. when the unidentified prisoner is seen trying to alert the tower, apparently was destroyed prior to receipt of the spoliation letter, according to Mr. Garner. Undersigned counsel is sure that Mr. Garner is truthful that he has been informed of this by management of MTC. Nonetheless, the missing video would in all likelihood have been the best evidence of whether MTC personnel ignored attempts by prisoners to obtain medical attention for Green as early as 4:00 a.m., or perhaps even earlier and could have settled the timeline of Mr. Green's cardiac crisis one way or the other. Whether MTC's destruction of the video was an intentional destruction of evidence to prevent its use in litigation is a fact determination which should be submitted to a jury. Along with the original sworn statements of prisoners Wilson and Pinkton and the affidavit of Linda Smith, the missing video would be the most important evidence in the case. Defendant MTC has not presented any documentary, or other evidence of the date or purpose of the destruction of the video footage. The jury should be given an instruction that they may make an inference adverse to MTC due to the destruction of the videos.

**j.    MTC ROUTINELY OVERWORKS ITS CORRECTIONS OFFICERS, RESULTING IN A LARGE TURNOVER OF PERSONNEL AND NEGLECT OF PRISONERS, INCLUDING JOHN GREEN, IV.**

Jadominique Phillips, the corrections officer who sounded the code blue, was in her second consecutive 8- hour shift. She arrived late because her replacement in her night shift was late in relieving her. This is a glimpse into the chaos at MCCF due to serious personnel shortage issues. The harsh working conditions at MCCF are illustrated by her deposition answers below: (By Attorney Lewis) .

Q.    Tell us what kind of hours you're expected to do and when you do them.

8

A.    We are expected to do two 16s and three eights.

Q.    Hours?

A.    Hours.

Q.    When do you do the two 16s?  Are they back to back?

A.    Mine was on Sundays and Tuesdays.  So back to back.

Q.    So you were actually there December 31 at night?

A.    Yes, sir.

Q.    Up to 6:00 and then some.  Why were you having to postpone going to your position in the Bravo—

A.    They were short of staff.  So they was trying to figure out who they was going to place where and to relieve the other people that had did a 16.

Q.    I realize that you had not been employed there very long.  How long had you been employed?

A.    We had started December 9th.  So we had probably been out on the field about, like, two or three weeks.

Q..    Okay. Actual employment?

A.    Right.

Q.    Okay.  Then how long did you continue working there?

a.    I continued working there for several months after and I quit in, like, June.

Q.    What was your reason for leaving?

A.    Understaffed, unfairness.

Q.    Can you be more specific about unfairness?

A.    Unfairness meaning, like, if it's not our16, they making us stay 16, not giving us relief, knowing we already did a 16 prior to the 16 they're making us do.

Q.    Did you ever had (sic) trouble staying awake?

A.    Sometimes.  Honestly, sometimes but your body get used to it.

Q.    Was your body used to it on that day?

A.    No. I had just started.

Plaintiffs Col. Exh. "1', Phillips Depo. Excerpts, p. 7, line 23—p. 9, line 15.

This conversation picked up again later in the deposition:

(By Attorney Lewis)

Q.      Was the staffing as far as you could tell on January 1st, on New year's (sic) Day, 2017, was it anything unusual compared to any other day?

A.      I missed part of that. Say that again.

Q.      You say you had to wait in your previous position that you had done in the earlier shift and where was that? Where were you stationed?

A.      In medical.

Q.      In medical?

A.      Uh-huh (affirmative response).

Q.      Okay. And you had done eight hours?

A.      Correct.

Q.      And then it turned into eight and a half hours?

A.      Right.

Q.      Okay. And that was because of what?

A.      Short of staff, understaffed.

Q.      Waiting for somebody to come relieve you?

A.      Yes, sir.

Q.      Relieve you after—or so you could go to your next job?

A.      Exactly.

Q.      Okay. I interrupted you when I asked you why you left and I asked you to talk about fairness. But when you were talking about fairness was it all about the hours you had worked?

A.      The hours, just really overworking you.

Q.      Okay.

A.      That was my biggest issue with MTC, they over work you.

(Plaintiffs' Co. Exh. "1", Phillips Depo. Excerpts, p. 12, line 1—p. 13, line 5.)


## III.

## THE PLAINTIFFS HAVE ESTABLISHED A GENUINE DISPUTE AS TO MATERIAL FACTS

The defense asserts "that the Plaintiffs' **entire case** is premised upon

now erroneous or mistaken affidavits from fellow inmates, along with Plaintiffs' expert witness's opinion which is based entirely on those faulty affidavits." Defendant's brief, unnumbered page 2. However, the fact that Wilson and Pinkton have recanted their original sworn statements at the 11[th] hour while in the custody and control of the Defendant does not automatically nullify those original statements. All the Defendant has done is to underscore the timeline dispute. Linda Smith, sister of the deceased, spoke directly with Wilson by telephone three days after her brother's death and signed a sworn affidavit that he (and other inmates) claimed Green's crisis began in the wee hours of New Year's day. Not only did Wilson not have a personal reason to lie to her, he and Pinkton both put themselves at risk of retaliation by MTC personnel by signing their sworn statements. Fear of retaliation is palpable in this case. Although Linda Smith tallied four phone numbers of inmates who called her, only one of those inmates dared to become a witness against their keeper. The dispute is about credibility, which is an issue for the jury. Furthermore, the affidavit of Linda Smith tips the scale in favor of the original affidavits. It is also ridiculous to claim that two and a half years after Green's death both inmates "refreshed their memories" simultaneously just in time to aid MTC in supporting the motion for summary judgment. The jurors should have no trouble inferring application of pressure of some sort to Wilson and Pinkton by MTC.

It is also apparent that MTC has a chronic shortage of personnel, because of unfair demands of long hours, a problem which MTC could resolve by hiring enough personnel to relieve the others of 16-hour shifts, including back to back 16-hour shifts. The result is poor and uneven care of the prisoners, including Green. It is apparent that for most of the night shift after midnight, Bravo 2 Dorm was undermanned. Indeed it is clear that for nearly an hour there was no guard in the tower and given the double shift work schedule of CO Gray, it is not surprising that she fell into a deep sleep while in the tower.

**IV.**

**PLAINTIFFS' RESPONSES TO MTC'S STATEMENT OF UNDISPUTED FACTS**

- Plaintiffs agree with items 1 and 2 concerning Greens conviction and sentence.

- Plaintiffs agree that MTC had a policy regarding offender counts and that MTC maintained records that indicated that offender counts were performed (items 3 and 4

- However, by separate motion Plaintiffs are challenging the admissibility and reliability of the records for January 1 prior to the code blue.
- Plaintiffs agree with item 5 concerning a policy on emergency medical services. However, that policy is not relevant in this case because that policy does not kick in until medical personnel are alerted by correctional officers of the emergency and MTC personnel unreasonably failed to acknowledge the emergency until it was too late to save Green's life, even though proper medical procedures were applied by nurses in the medical ward.
- Plaintiffs agree with item 6. but deny that this was the first attempt to seek aid for Green See original affidavits of Wilson, Pinkton and Linda G. Smith.
- Agreed as to the time of the code blue and the time line to the medical ward. (items 7, 8 and 9.)
- Agreed as to the arrangement between MTC and the MDOC (item 10).
- Agreed that the document speaks for itself (item 11)
- Agreed that MTC was not contractually responsible for providing medical care to the inmates at MCCF. (Item 12) However, MTC had a constitutional duty to promptly get Green to medical care and failed to do so because of the chaotic scheduling of shifts and shortage of correctional officers, as well as deliberate indifference of personnel who ignored pleas for help. (See deposition excerpts for Jadominique Phillips, above., as well as the original sworn statements of Wilson, Pinkton and Smith) .
- Again, Plaintiffs agree that contractually health care decisions rested solely with a different corporation, Centurion of Mississippi, LLC. However, MTC had a constitutional duty to timely alert Centurion medical staff of medical emergencies, but failed to do so for the reasons set out in the immediately preceding paragraph.

## V.

## SUMMARY JUDGMENT STANDARD

Plaintiffs agree with the Defendant's statement of the law regarding the summary judgment standard, so far as it goes. In addition the evidence and reasonable inferences must be viewed in the light most favorable to the opposing party. *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014). "In considering the motion, the district court must draw inferences most favorable to the

party opposing the motion, and take care that no party will be improperly deprived of a trial of disputed factual issues." *United States Steel Corp. v. Darby* 516 F.2d 961, 963 (5th Cir. 1975). "It is inappropriate to make credibility determinations or weigh the evidence." *Moore v. Willis Indep. Sch. Dist.*, 233 F. 3d 871, 874 (5th Cir. 2000).

## VI.

## MTC HAS A FLAWED DELIBERATE POLICY OR CUSTOM OF PERSONNEL MANAGEMENT WHICH RESULTED IN THE DEATH OF JOHN GREEN, III

Robyn Williams was deposed as the representative of MTC under Rule 30(b)(6). She was asked to respond to the following question:

"What—what can you say about our paragraph 6, here, 'Describe backup measures, if any, which MTC employs routinely or otherwise to compensate for no-show correctional officers' since that seems to be a problem?

She answered:

A.      So it's a matter of trying to get people to stay over from the previous shift and or have other people come in if it's—if it's their day off and you can get ahold of them and have them— have them come in.

Plaintiffs' Exh. "7", Williams depo.Excerpts p.55, line 18-p,56, line 2.

That reply led to the following Q and A exchange:

Q.      Okay.  So that would be the shift supervisors trying to arrange all of that?

A.      Yes.

Q.      Okay.  What—what is your perception of the extent to which the staff was effective or— or—what's the word I'm looking for—whether the—the dorm was properly staffed during these two shifts?

A.      Well, staffing, like we talked about earlier, is an ongoing issue trying to—just trying to hire and keep enough people.

Q.      And that—that was true of that dorm that night?

A.      Yes.

Q.      Okay.  And early morning?

A.      Yes.

13

Plaintiffs' Exh. "7", Williams depo. Excerpts. p,56, lines 7-22.

Ms. Williams completely corroborates the deposition testimony of CO Phillips about understaffing, shown above. Each prison shift begins a new frantic search for personnel. Employees cannot get to their second shift on time because they have to wait for shift supervisors to find someone to relieve them from the first shift. Apparently MTC does not pay enough to keep employees, so they leave and those who are left are burdened with double shifts, including back to back 16-hour shifts, according to CO Phillips, or being called in on their day off. MCCF is in constant turmoil. No wonder CO Gray fell asleep. No wonder CO Gray ignored her subpoena. No wonder Mr. Green was ignored for hours.

MTC's first priority and first obligation as a private corporation is to satisfy its investors, which is in conflict with and in this case takes precedence over the welfare of the prisoners. MTC routinely understaffs its operations in order to keep payroll costs at a minimum and put more money in its investors' pockets. There is an inherent conflict between the corporation's first priority, investor profits, and the corporation's constitutional duty to tend to the serious medical needs of the prisoners. It is a for profit business enterprise. Attention to those medical needs by the medical staff is wholly dependent upon the correctional staff identifying the problem and alerting the medical staff. Green, sadly, was a victim of that inherent conflict. He sat on the floor for hours, gasping and holding his chest. Any alert corrections officer would see a need to alert medical staff immediately.

MTC's highest prison administrators are the decision-makers and policy-makers who subordinate the welfare of the prisoners to investor profit. The Plaintiffs have identified the policy or custom responsible for delay in assistance to Green. By routinely understaffing the prison, the company is deliberately indifferent every day and every hour of every day to its constitutional obligation to put the serious health and welfare needs of its prisoners above profits. The profit motive results in understaffing which in turn puts the inmates at risk in emergencies. It is the "moving force" which results in subpar attention to the prisoners' needs, including Green's needs. The Plaintiffs submit that they have established an unwritten custom or practice that was not formally written or adopted, but that is a pervasive, long-standing practice that essentially has the force of law. *Sharp v. City of Houston,* 164 F.3d 923, 936 5th Cir. 1999)

## VII.

## MTC IS DIRECTLY OR VICARIOUSLY LIABLE TO THE FAMILY OF JOHN GREEN, III UNDER MISSISSIPPI LAW OF NEGLIGENCE

**a.     PREFACE**

As is indicated by the reference in paragraph 1 of the Amended Complaint to the minimum jurisdictional amount of $75,000.00, undersigned counsel intended to state the negligence claim should be reviewed under the court's diversity jurisdiction since MTC is an out-of-state corporation, as indicated in paragraph 8 of the Amended Complaint. The undersigned unintentionally omitted reference to the diversity jurisdiction statute, 28 U.S.C. §1332. If the court deems it necessary to formally amend the Amended Complaint to more clearly state a diversity claim by adding the diversity jurisdiction statute, undersigned counsel respectfully requests permission to clarify that jurisdictional issue. Alternatively, undersigned counsel did recite the supplemental jurisdiction statute.

**b.     ARGUMENT**

If the court finds the Plaintiffs' federal claim inadequate to withstand summary judgment, the Plaintiffs respectfully request that the court review the negligence, gross negligence and vicarious liability claims.

Plaintiffs agree with the defense that to state a negligence claim, they must establish a duty and present competent evidence that the Defendant breached that duty and that the breach actually and proximately caused their injuries. Plaintiffs' disagree that they have not identified a prison employee who acted negligently. On the contrary, based on the original sworn statements of Wilson and Pinkton, the guard in the tower slept as prisoners tried to alert her to the emergency. The lawyers for both sides only learned during the deposition of Robyn Williams that that guard had to be Dorothy Gray. Plaintiffs' Exh. "11", Williams depo. p.55, line 18-p,56, line 2. Sleeping on the job while posted in the important position in the tower for the very purpose of being able to spot trouble would certainly be grounds for being fired. Even if she had not been identified by name, she was identified as a corrections officer working for MTC and she was clearly negligent. In any event we finally did learn her name. The Plaintiffs have not had an opportunity to speak with her since she ignored her deposition subpoena. But if she had

been awake and alert John Green might have lived. As the defense admits, "An entity (such as MTC) can be held liable for the acts or omissions of its employees acting within the course and scope of their employment.. (citing *Elliott v. Mgmt & Training Corp*, 2017 U.S. Dist. LEXIS 111975 (N.D.. Miss. 2017)

# VIII.

## CONCLUSION

The Plaintiffs respectfully submit that they have raised significant material issues of fact requiring resolution by a jury, both as to their 8th Amendment claim and their vicarious liability claim based on the negligence of Dorothy Gray. It is not necessary that Gray be named as a party to this lawsuit in order for MTC to be held responsible for her negligence. The Defendant's motion for summary judgement should be dismissed.

RESPECTFULLY SUBMITTED, this the 12th day of July, 2019.

BRENDA GREEN, et al.

By:    */s/ Ronald W. Lewis*
Ronald W. Lewis (MSB # 1242)
404 Galleria Lane, Suite 5
Post Office Box 2729
Oxford, Mississippi 38655
Phone: (601) 234-0766
ron@ronlewislaw.com

16

## CERTIFICATE OF SERVICE

I do hereby certify that I have this date electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system which sent notification of such filing to all counsel of record.

RESPECTFULLY SUBMITTED this the 12th day of July, 2018,

*/s/ Ronald W. Lewis*
RONALD W. LEWIS